ALBERT S. CALDWELL ET AL. *v.* JOSIAH S. WALKER.

1. *Fraudulent conveyance. Purging fraud.*

   If a conveyance be fraudulent as against the creditors of the grantor
   when executed it will not be validated by the grantee remaining
   in possession and paying debts of the grantor exceeding in amount
   the value of the property.

2. SAME. *Ex post facto purgation. New conveyance.*

   There is not, properly speaking, any *ex post facto* purgation of fraud;
   but a fraudulent conveyance before the rights of third persons
   intervene may be abandoned and a new conveyance made in good
   faith.

FROM the chancery court of Washington county.

HON. A. H. LONGINO, chancellor.

Walker, the appellee, was the complainant in the court
below; Caldwell and others, the appellants, were defendants
there. The object of the bill was to set aside, as fraudulent, a
certain deed executed by defendant Dudley to Caldwell, as hav-
ing been executed to defraud the grantor's creditors, of whom
the complainant was one. Much testimony was taken, and it
was conflicting, but the court below canceled the deed and
decreed in complainant's favor. From this decree the defend-
ants Caldwell and others, appellants, appealed to the supreme
court.

Appellants contended that as all dealings between the parties
had long since terminated, and Caldwell had been in absolute
possession of the property conveyed to him for a number of
years, dealing with and treating it as his own, and that as the
grantee had since the execution of the deed extinguished *bona
fide* debts of Dudley in excess of the value of the property,
the conveyance was purged of fraud, even if it was fraudulent
in the first instance.

*Miller, Smith & Hirsh* and *Calvin Perkins*, for appellants.

1. In a conveyance by an insolvent debtor to liquidate an antecedent debt different principles apply than when cash or present consideration is paid. If only sufficient property be conveyed to satisfy debt, motive of either party is immaterial. There is a manifest and just distinction now maintained and enforced by both courts of law and of equity between the rights of a mere volunteer purchasing assets, either for an adequate or insufficient consideration, from an insolvent debtor, against or to which he has no claim or equity, as a creditor, or otherwise, and chargeable with notice of the intent of said debtor thereby to hinder, delay or defraud his creditors, and of the creditor making said purchase to satisfy his debt, and thereby acquiring no more property than may be reasonably sufficient for that purpose, although with full knowledge of the debtor's fraudulent intent. In the former case there has been abstracted, or withdrawn, from the reach of creditors property liable to be subjected to the payment of the debtor's indebtedness, and the sale, although not void, is voidable, at the election of the injured creditor. In the latter, the debtor's obligations to the value of the assets have been liquidated, and no pecuniary injury to other creditors has resulted, and, therefore, the corrupt intent of either, or both, parties is immaterial, and the transaction must be held to have been made "in good faith," and unassailable. *Clements* v. *Moore*, 6 Wallace 299; *Hirsch Bros. & Co.* v. *Richardson*, 65 Miss., 227; *Pollock* v. *Meyer*, 96 Ala., 172; *Bamberger* v. *Schoolfield*, 160 U. S., 149.

2. Whenever a conveyance from a debtor to his creditor is assailed, the primal test of the right of the attacking party to relief is, has he been pecuniarily harmed by the transaction? *Ibid.*

3. In dealing with fraudulent conveyances, courts of equity exercise a more flexible and tolerant jurisdiction than courts of law. The cardinal principle is that property should

not be diverted from payment of debts, to the injury of creditors.

. '' When the fact of fraud is established in a suit at law, the buyer loses the property, without reference to the amount or application of what he has paid, and he can have no relief, either at law or in equity. When a proceeding is in chancery, the jurisdiction exercised is more flexible and tolerant. The equity appealed to, while it scans the transaction with severest scrutiny, looks at all the facts and gives to each one its due weight—deals with the subject before it according to its own idea of right and justice. . . . Where he (the buyer) has honestly applied the property to the liabilities of the seller, it may hold him excused from further responsibility. The cardinal principle in all such cases is that the property of the debtor shall not be diverted from the payment of his debts, to the injury of his creditors, by means of the fraud.'' *Clements* v. *Moore*, 6 Wall., 299; *Redfield* v. *Hewes*, 67 Miss., 479; *Thomson* v. *Hester*, 55 Miss., 656, and *Hester* v. *Thomson*, 58 Miss., 109.

4. Fraudulent conveyances not void, but voidable. Only persons injured can complain. A fraudulent transaction is not absolutely void, but, on the contrary, is simply voidable, and then only at the instance of the party who shows that some substantial financial injury or harm has thereby been perpetrated upon him. *Ibid.*

5. ''Fraud gives no action in any case without damage.'' Bouvier Law Dictionary, 614, title Fraud.

6. Conveyance lawful. Intent cannot invalidate. Where a conveyance from a debtor to a creditor is lawful, the motives of the parties thereto can do no injury to the non-preferred creditors, and no human tribunal can set aside a transaction legal in itself because the actors have an evil mind in doing it. *Hodges* v. *Coleman*, 76 Ala., 103.

7. Equity considers results rather than the means of attaining them. *Savage* v. *Dowd*, 54 Miss., 728.

8. If conveyance of debtor to creditor extinguishes more

debts than value of property no injury results. If the dealings between a debtor and his creditor ultimately resulted in the extinguishment of more of his liabilities than the value of all his property, before the other creditors sought to subject the same, they have no legal or equitable cause for complaint. *Hodges* v. *Coleman*, 76 Ala., 103; *Clements* v. *Moore*, 6 Wallace, 299; *Hutchins* v. *Sprague*, 4 N. H., 469.

9. Conveyance by insolvent to pay debts valid if debts exceed value of property. Right to redeem when said debts are paid or secured does not invalidate. A creditor who has acquired control of debts exceeding the value of the property obtained by him from a failing debtor, whose main purpose in acquiring said property was to protect said debts, should not be deprived of the fruits of his trade at the instance of a non-preferred creditor, although when he acquired said property it was understood that the debtor could repurchase the same within sixty days thereafter by paying or securing said debts. Incidental protection to a failing debtor who anticipates compromising with his other creditors for twenty-five cents on the dollar, which was all the available means he possessed, cannot defeat said conveyance. *Hirsch* v. *Richardson*, 65 Miss., 227; *Carey-Halliday Lumber Co.* v. *Cain*, 70 Miss., 628.

10. A conveyance of sufficient property to pay debts is valid, and it is immaterial whether conveyance is direct to debtor or third person. "An insolvent debtor may convey his property to a creditor in payment of his *bona fide* debt to said creditor, notwithstanding said debtor and creditor, or either of them, intended thereby to hinder, delay, and defraud other creditors of said debtor, provided the value of the property conveyed did not exceed the amount of the debt thus liquidated. And it is immaterial whether said conveyance is made directly to the creditor or to a third person, who, before a nonpreferred creditor attacks the same, has applied said property, or the proceeds thereof, to the satisfaction of said debt." *Clements* v. *Moore*, 6 Wallace, 299.

11. Transferee of goods not liable as trustee when he pays or assumes to pay value of goods. "Where to defraud creditors a debtor transfers goods to one who *bona fide* pays, or assumes to pay, on account of the goods, debts to the value of said goods, the transferee cannot afterwards be charged as trustee of the debtor." *Hutchins* v. *Sprague*, 4 N. H. 469.

12. *Locus pœnitentiæ.* Conveyance may be purged of fraud. "A conveyance originally fraudulent against creditors may be purged of the fraud, by matter *ex post facto*, whereby the fraudulent intent is abandoned, and the grant confirmed, for a good and adequate consideration *bona fide.*" *Oriental Bank* v. *Hoskins*, 3 Met. (Mass.), 332.

13. The same. "Where a trustee has received goods under circumstances indicative of fraud and which would have fixed him as trustee, but before the service of process upon him had paid the debts of the principal to the amount of the goods received, he is not liable to the creditors of the principal." *Thomas* v. *Goodwin*, 12 Mass., 140.

14. A judgment lien is neither *jus in re* or *jus ad rem*. "A judgment lien is neither *jus in re* or *jus ad rem;* it is not the thing (on which it exists), nor does it constitute a right of action for the thing, it is a mere charge on the thing, which can only be enforced by taking it in execution." "The general lien of a judgment does not *per se* constitute a right of property, but it confers a right to levy the exclusion of adverse interest subsequently acquired." George's Digest, 444.

15. Good faith. Agreement to reconvey. Right of other creditors. "Where a sale is made in good faith to pay or secure a creditor, the fact that there is an understanding that the property is to be reconveyed when the debt is paid will not invalidate the sale; nor will the fact that the purchaser knows there are other creditors, and is anxious to close the transaction before they can interfere. So held as against attaching creditors in this case, where an absolute bill of sale was given, which was not recorded, the purchaser, however, taking immediate possession."

16. The same.    Although the agent of the purchaser admits that he agreed with the seller to deed the property back as soon as he got the money, and the agent of the seller said the sale was not *bona fide*, and that, when the buyer got its money, the property was to be deeded back, still these facts would not invalidate the sale.    *Carey-Halliday Lumber Co.* v. *Cain*, 70 Miss., 628.

17. Decree setting aside sale must subject property still in hands of purchaser.    Where a fraudulent purchaser still owns the property, the creditor must subject it, and cannot take a personal money decree for his debt, or the value of the property, against the purchaser.    *Delta Bank* v. *Oliver-Finney Grocery Co.*, 70 Miss., 868.

*Yerger & Percy*, for appellees.

Through all the mass of testimony, in so many multifarious ways, is exhibited and obtruded the fraudulent nature of the conveyance made by Dudley to Caldwell that we feel inclined simply to ask the court to read the record and judge for itself, and we can scarcely refrain from apologizing to the court for making what seems to be an almost invidious distinction in calling attention to a few of the more prominent circumstances that stand out, perhaps, a little more boldly than the other facts in the case, swollen and pregnant with the fraud that permeates and exudes from the entire transaction.    In considering the character of the transaction we invite the attention of the court first to the origin of the scheme, the purpose for which it was contrived, and the motives actuating the parties in making it.    In what brain did the idea of Dudley making a conveyance to Caldwell originate?    What impulse gave it birth?    Did it have its origin in the watchfulness of a vigilant creditor fearing that his debt was endangered, or did the misgivings of an anxious and troubled debtor, lest his favored creditor might not be secured in the amount due him, give it birth, or did it spring from the desire of a hard-pressed

debtor to defraud the creditors who were seeking by diligence
to collect their dues through the scheme of a sham conveyance,
made possible by the weak indulgence of a friend, and plausi-
ble by that friend being the representative of his largest cred-
itor? The testimony of Dudley, corroborated by Johnson, and
supported by all the circumstances in the case, and undisputed,
shows that the idea of making a sale, conveyance, or some
arrangement of his property, first originated in Dudley's mind
owing to the fact that several of his creditors, and especially
the Bank of Greenville, were pressing for judgments, which
would be rendered at the December term of the court.

Nowhere in the testimony can there be found any evidence
of an intention on the part of Dudley to do other than cover
up his property so that his importunate creditors could not
reach it, and, when this was done, apparently successfully,
through Caldwell's co-operation, we find him strong in his
professions of gratitude to Caldwell, as expressed to him in his
letter of December 12, 1892, immediately following the sale:
"You have saved my home." There is nowhere any expres-
sion to the effect that he was deserving of commendation for
having stripped himself of his property for the payment of his
debts. On the other hand, there is nothing to indicate that
the transaction was of Caldwell's seeking. Caldwell testifies
that he consented to the proposed transfer on the urgent solic-
itation of Dudley. Campbell, the attorney who attended to
the transfer, says that Caldwell was anxious to do all that he
could to help Dudley, but did not want to imperil the interests
of his mortgage company. Johnson, the only outside party
cognizant of the entire transaction, says that it was all done for
the benefit of Dudley, and this corroborates the direct evidence
of Dudley on this point. Furthermore, there is no expression
anywhere in the many letters which passed between Caldwell
and Dudley, on the part of Caldwell of any gratitude to Dudley
for giving up his property in payment of his debts. Dudley
said: "You have saved my home." Caldwell never said:

"You have saved me or my clients." From the time of the sale, in 1892, to February, 1896, Dudley posed as the beneficiary in the transaction, and Caldwell as the benefactor; and on the morning after the sale was made, when Caldwell, at the residence on the Mount Holly plantation, was approached by Johnson and requested to give some writing to show Dudley's interest in the property, he replied that Dudley would have to rely upon his honor; that he had treated him as he would a brother, and that, if he (Dudley) was not satisfied, he was perfectly willing to call the entire trade off. There is nothing in this to show that he had asserted any rights for a restless creditor, or had consummated any deal which he considered desirable for his company. On the contrary, having done so much for his friend Charles, he felt aggrieved that absolute and implicit reliance was not placed in him.

There cannot be a suggestion of doubt but that the proposed transaction was conceived by Dudley, was intended to be for Dudley's benefit, and for the purpose of protecting him against the demands of his creditors.

In the next place, how was the proposed scheme carried out? The point on which Dudley needed most protection was as to the property covered by the trust deed of Pepper. While the trust deed was for eight thousand and four hundred dollars, one-half had been paid, and the security which it embraced was ample to secure the entire indebtedness. While one of the notes had been paid Pepper had been requested not to mark the note paid. Dudley testifies that Caldwell knew exactly the status of the indebtedness with Pepper. Caldwell denies this, but states that he knew that four thousand dollars or more had been sent to Pepper and was held by him. This seems to be immaterial. In his letter of November 14th to Dudley, Caldwell urged him not to pay the indebtedness held by Pepper, that the payment of it would expose the property embraced in the trust deed to the attacks of his creditors, and using strong language said: "It will be the mistake of your life to pay the

Pepper debt.'' He knew, because he had consented to its being done, that two hundred and twenty-five bales of cotton had been shipped to Day & Co., in New Orleans, for the purpose of applying the proceeds of the same to the payment of this Pepper indebtedness. Notwithstanding these facts, at the solicitation of his friend Dudley, Caldwell authorized Dudley to wire Pepper to draw upon him or the Delta Cotton Company, of which he was president, for the entire debt of eight thousand and four hundred dollars, attaching to the draft the trust deed and the two notes, this being done as the first essential step in affording protection to his friend Dudley, not in the collection or securing of any debt due him or the mortgage company. He and Dudley took the train for Greenville in order to complete the transaction, and on arrival there went to the office of Mr. Campbell, having been joined at the depot by Johnson, the uncle of Dudley, who was present as a witness at the conference in Campbell's office. Here they unfolded and detailed the proposed transaction, including the purchase of the Pepper trust deed to Campbell. As to the details of this conference and Campbell's advice in regard to the transaction Caldwell's testimony differs from that of all other persons present. In fact, in every instance where any essential feature of this transaction is testified to by Caldwell and other parties he is contradicted by their testimony, and his testimony fails to support and contradicts the allegations of his own sworn answer. According to the testimony of the other three persons who were present Campbell gave it as his opinion that the proposed transaction would not hold; that it fell under the condemnation of the court in *McLean* v. *Letchford*, 60 Miss., 169, and if it was carried out and attacked by creditors, not only would the sale not be sustained, but the party advancing the money for the purchase of the Pepper trust deed would not be reimbursed for the outlay.

The deed recited a consideration of $37,000. As a matter of fact not one cent was paid by Caldwell. The consideration

recited was fictitious. Not a single debt of Dudley's was extinguished by the conveyance—the payment of not a single debt was assumed by Caldwell as a consideration. The testimony on this point is plain, and there is no dispute or contradiction in regard to it. Caldwell does not claim that he paid any money to Dudley. It is not claimed that any debt was extinguished by the conveyance, or that he assumed the payment of any. He testifies, incidentally, of an indebtedness of $500 being due to him, and as to various debts the amount of which he did not know, which he knew he would have to pay, but these were debts which it is evident he knew he would have to pay in order to preserve the property. But the payment of none of them was made or secured by the conveyance to him.

The whole course of the correspondence between the parties indicates that Dudley was recognized as having an interest in the property. He remained on it without the payment of any rent, or any demand being made for the surrender of possession by him, from December, 1892 to February, 1896. He drew out of the store what was necessary for his household expenses during the year 1893 without asking permission or without objection being made thereto, drawing out over $800 worth of merchandise and money, and by the collection of some accounts reduced the amount to $558. Payment of this was never demanded, and Dudley testifies that it was never considered by him an indebtedness.

What was the legal effect of the conveyance made by Dudley to Caldwell? Clearly fraudulent and void as to Dudley's creditors. In the first place, it was a voluntary conveyance. There was no consideration for it; no money passed, no debts were paid, and none assumed, and it does not need citation of authority to show .that such a conveyance is void as to creditors. In the next place the conveyance, according to the testimony of the parties connected with it, hindered, delayed, and defrauded creditors of Dudley, and especially the appellee in this case. It was a sham, for the purpose of warding off creditors and forcing them to a

settlement.    It was made in order to enable Dudley to dictate terms to his creditors, and this is fraudulent.    *May* v. *Voight*, 62 Miss., 500.

WHITFIELD, J., delivered the opinion of the court.

If profound legal ability were all that was needed to save an utterly bad cause, the appellant might entertain hope; but the facts in this record are beyond legal medicament, and bring the case squarely within the condemnation of *McLean* v. *Letchford*, 60 Miss., 169, and *May* v. *Taylor*, 62 Miss., 500, as appellant was duly advised at the outset by learned counsel.

It is said that there has been here an *ex post facto* purgation of the actual fraud tainting the original conveyance, and the *Oriental Bank* v. *Hoskins*, 3 Met., 332, and *Hutchings* v. *Sprague*, 4 N. H., 469, and *Thomas* v. *Goodwin*, 12 Mass., 140, are mainly relied on to support the view.    In the first case there was a "new agreement," by reason of which the original paper stipulating for a reconveyance had become unimportant, and the whole discussion shows that it was the validity of the new agreement which protected the party. *Hutchings* v. *Sprague* is severely criticised in a later case in New Hampshire (*Boardman* v. *Cushing*, 12 N. H., 105, and in *Albee* v. *Webster*, 16 N. H., 362, 370).    *Hutchings* v. *Sprague* and *Thomas* v. *Goodwin*, *supra*, are both said by Chief Justice Parker to hold merely that: "A sale may be fraudulent as to creditors on account of a secret trust accompanying it, but if, by a subsequent agreement, before the creditors interfere, the secret trust is discharged, and the sale is otherwise valid, the fact that the trust once existed will not operate longer to vitiate the sale, the fraud being purged."    And Mr. Bigelow says (2 Bigelow on Fraud, 408) that, where, "After the conveyance has been made, and before any steps have been taken against it by the creditor, a reconveyance is made, this is proper, and there is nothing then for the statute to operate upon;" and, concluding a review of the authorities, he says: "On the

whole (p. 411) it is difficult to sustain the doctrine of purging fraud in its ordinary manifestation, and it is better to leave the parties to the unlawful transaction in the meshes of their own net.''

The true view is that there is not, properly speaking, any *ex post facto* purgation of fraud, a doctrine which would encourage fraud and put a premium upon its perpetration. Cases which are said to illustrate that doctrine are often misunderstood, and simply hold that, where a conveyance which is voidable for fraud has been abandoned, and, before the rights of third parties intervene, a new and independent conveyance is made in good faith, it will be upheld, not because of any supposed purging of the fraud from the old, but because of the good faith and legality of the new conveyance.

But, whatever the true doctrine, it has no possible application on the facts of this case. It is wholly immedicable. We see no good to be subserved by setting out at large the facts.

*Affirmed.*